**UNITED STATES of America,**

v.

**Osama AWADALLAH, Defendant.**

**No. 01CR1026(SAS).**

United States District Court, S.D. New York.

April 30, 2002.

As Amended May 13, 2002.

Robin Baker, Karl Metzner, Celeste Koeleveld, Rosemary Nidiry, Assistant United States Attorneys, United States Attorney's Office, Southern District of New York, New York, NY, for the Government.

Jesse Berman, New York, NY, for Defendant.

## FIRST OPINION AND ORDER

SCHEINDLIN, District Judge.

The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances. No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government.

—*Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 120–21, 18 L.Ed. 281 (1866)

The imperative necessity for safeguarding these rights ... under the gravest of emergencies has existed throughout our constitutional history, for it is then, under the pressing exigencies of crisis, that there is the greatest temptation to dispense with fundamental constitutional guarantees which, it is feared, will inhibit governmental action.

—*Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 165, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963)

It would indeed be ironic if, in the name of national defense, we would sanction the subversion of one of those liberties ... which makes the defense of the Nation worthwhile.

—*United States v. Robel*, 389 U.S. 258, 264, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967)

## I. INTRODUCTION

Designed in 1787 to create a strong federal government, the United States Constitution now stands as the oldest living written constitution in the world. Yet, when the Constitution was presented to the states for ratification, the people viewed it as fundamentally flawed because it failed to provide them protection from the government. Experience had taught them that government officials would be prone to disregard civil liberties in pursuit of their own goals. "Vivid in the memory of the newly independent Americans," for example, "were those general warrants known as writs of assistance under which officers of the Crown had so bedeviled the colonists." *Stanford v. Texas*, 379 U.S. 476, 481, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965). Those general warrants were viewed "as the worst instrument of arbitrary power, the most destructive of English liberty, and the fundamental principles of law, that ever was found in an English law book, because they placed the liberty of every man in the hands of every petty officer." *Id.* (quotation marks omitted).

As a result, in December 1791, the Bill of Rights became "the supreme Law of the Land." U.S. Const. art. VI cl. 2. The Fourth Amendment states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. "These words are precise and clear. They reflect the determination of those who wrote the Bill of Rights that the people of this new Nation should forever 'be secure in their persons, houses, papers, and effects' from intrusion and *seizure* by officers acting under the *unbridled authority of a general warrant*." *Stanford*, 379 U.S. at 481, 85 S.Ct. 506 (emphasis added).

\* \* \* \* \* \*

▇ In 1984, Congress enacted 18 U.S.C. § 3144 ("section 3144"), commonly known as the "material witness statute." Section 3144 states in full:

If it appears from an affidavit filed *by a party* that the testimony of a person is *material* **in a criminal proceeding,** and if it is shown that it may become impracticable to secure the presence of the person by subpoena, a judicial officer may order the arrest of the person and treat the person *in accordance with the provisions of section 3142 of this title.* No material witness may be detained because of inability to comply with any condition of release *if the testimony of such witness can adequately be secured by deposition,* and if further detention is not necessary to prevent a failure of justice. Release of a material witness may be delayed for a reasonable period of time until the deposition of the witness can be taken pursuant to *the Federal Rules of Criminal Procedure.*

18 U.S.C. § 3144 (various emphases added). In enacting this statute, Congress carved out a carefully limited exception to the general rule that an individual's liberty may not be encroached upon unless there is probable cause to believe that he or she has committed a crime. Properly read, the statue only allows a witness to be detained until his testimony may be secured by deposition in the pretrial, as opposed to the grand jury, context.

\* \* \* \* \* \*

On Friday, September 21, 2001, FBI agents in California arrested Osama Awadallah as a material witness for a grand jury investigation of the September 11th terrorist attacks.[1] Approximately three hours later, an affidavit in support of an application for Awadallah's arrest under section 3144 was submitted to a judge of this Court by an FBI agent and a warrant was issued. Over the next twenty days, Awadallah was treated as a high-security inmate, detained in various prisons across the country. Awadallah was eventually flown to New York, where he was kept in solitary confinement and shackled and strip-searched whenever he left his cell. He was unable to have family visits or use the telephone because the prison had no operating telephones and was on a high security alert which prevented family visits. Awadallah was held as a material witness in a grand jury investigation; he was not arrested based on probable cause to believe that he had committed any crime.

On October 10, 2001, Awadallah testified, without immunity, before a grand jury in New York. Dressed in prison garb and handcuffed to a chair, he was asked several hundred questions over the course of the day. Awadallah's testimony was consistent with everything he had previously told the government. Awadallah had met two of the hijackers involved in the September 11th attacks eighteen months earlier and had last seen them a year earlier. Although Awadallah described the physical appearance of both of these men, he could only recall the name of one, Nawaf Al–Hazmi. Awadallah also testified, just as he had informed the government on two occasions, that he had meet

---

1. "Tr." refers to the transcript of the hearing held on February 15 to 18, 2002. "GX" refers to a Government exhibit at the hearing; "[date] Tr." refers to the transcript of court or grand jury proceedings on the indicated date. "GJX" refers to a grand jury exhibit. "Berman Aff." refers to the Affirmation of Jesse Berman, Esq., dated December 3, 2001. "Awadallah Aff." refers to the Affidavit of Osama Awadallah, dated December 26, 2001.

"Gov't Mem." refers to the "Government's Post–Hearing Memorandum in Opposition to Defendant's Motions to Dismiss the Indictment and to Suppress the Evidence." "Reply Mem." refers to the Government's Post–Hearing Reply Memorandum. "Plunkett Aff." refers to the affidavit submitted by Special Agent William Ryan Plunkett on September 21, 2001.

Al–Hazmi approximately forty times, mostly at work and at the local mosque.

When the government repeatedly asked whether he knew anyone named "Khalid Al–Mihdar" or anyone named "Khalid," Awadallah said no. At the end of the day, however, the government produced an examination booklet that it had received from Awadallah's teacher, eight days earlier, on October 2.[2] Inside the booklet, Awadallah had written: "One of the quietest people I have met is Nawaf. Another one, his name Khalid. They have stayed in San Diego for 6 months." *United States v. Awadallah* (*"Awadallah II"*), 202 F.Supp.3d 17, 32 (S.D.N.Y.2002) (referring to GJX 41). Awadallah immediately denied writing the name "Khalid" in the booklet. However, five days later, when he again testified before the grand jury, Awadallah testified that he had written the word "Khalid." When asked if he "recalled any part of this man's name," Awadallah testified that he thought that the "man's name was Khalid." 10/15/01 GJ Tr. at 8. The government subsequently charged Awadallah with two counts of knowingly making a false material declaration before the grand jury for: (1) testifying that he did not know Khalid's name, and (2) testifying that he did not write the word "Khalid" in the exam booklet.[3] *See* Complaint, *United States v. Osama Awadallah*, No. 01 Mag. 1833 (filed October 18, 2001) ¶¶ 1–2 (citing 18 U.S.C. § 1623(a)).

Awadallah spent eighty-three days in prison before being released on bail.

## II. PROCEDURAL HISTORY

Awadallah was arrested on the perjury complaint on October 21, 2001, and indicted on two counts of perjury on October 31, 2001. *See United States v. Awadallah*, 173 F.Supp.2d 186, 187 (S.D.N.Y.2001). This Court set bail with conditions on November 27, 2001. *See id.* at 192–93. Awadallah satisfied those conditions on December 13, 2001. *See Awadallah II*, 202 F.Supp.3d at 19.

On December 3, 2001, Awadallah moved for an evidentiary hearing "to suppress (1) all physical evidence found by law enforcement officers who searched his home, computer and cars, and (2) all statements that he made to any government agent from September 20, 2001 through October 3, 2001," as well as to dismiss the indictment. *Id.* On January 31, 2002, this Court granted the motion for an evidentiary hearing and reserved its right to dismiss the indictment. *See id.* at 54. An evidentiary hearing was held on February 15–18, 2002.

## III. SEPTEMBER 21, 2001 THROUGH OCTOBER 10, 2001

Many of Awadallah's allegations about his treatment during the weeks of incarceration are uncontested. Reading the allegations in the light most favorable to the government,[4] his incarceration can be sum-

---

2. "After the hearing, the Government determined that AUSA [Robin] Baker had first been advised on October 6, 2001, of the existence of Awadallah's 'journal entry.' She received a more detailed description on October 10, and then received the document itself late that afternoon," shortly before it was used in the grand jury. Gov't Mem. at 40 n.54 (citing Tr. at 98–99).

3. "A false statement is material if it had the natural or probable effect or tendency to impede or dissuade the grand jury from pursuing its investigation." 2 Leonard B. Sand et al., *Modern Federal Jury Instructions—Criminal*, ¶ 48.03, at 48–24 (2001).

4. Because Awadallah's allegations of abuse and general mistreatment during his incarceration are not material to the issues before the Court on this motion, I make no findings of

marized succinctly: Awadallah was treated as a high security federal prisoner. Having committed no crime—indeed, without any claim that there was probable cause to believe he had violated any law—Awadallah bore the full weight of a prison system designed to punish convicted criminals as well as incapacitate individuals arrested or indicted for criminal conduct.

Awadallah was incarcerated in four prisons and suffered many of the hardships imposed on all federal prisoners.[5] In many ways, however, the conditions of his confinement were more restrictive than that experienced by the general prison population. He was immediately put in solitary confinement in the special housing unit ("SHU") of the San Diego MCC and, unlike other prisoners, prohibited from having family visits. *See* Tr. at 502–03. In response to Awadallah's allegation that he was denied showers, the government has explained that "in the SHU, an inmate is offered a shower every other day, but a shower for a high security inmate—which Awadallah was—could be delayed if no lieutenant was available [for the shower]." Gov't Mem. at 19 (citing Tr. at 495–99). Likewise, "[t]he Government does not dispute Awadallah's testimony that he was strip searched each time he was taken from and to his cell," Gov't Mem. at 20, which Awadallah estimated occurred about

ten to fifteen times at the San Diego MCC alone, *see* Tr. at 996.

Awadallah was not permitted to call anyone prior to being moved to New York or while in transit because the "San Diego MCC [had] passed along the order that the material witnesses would not be allowed to make phone calls." *Id.* at 604. *See also id.* at 574, 995, 1003. Thus, it was only on the morning of October 1st that Awadallah's lawyer, Randall Hamud, learned from the government that Awadallah was in New York. *See* GX 503 at 9. Until then, Hamud had been unable to locate Awadallah after he left San Diego.[6] *See id.* Whenever Awadallah was transported anywhere (*e.g.*, a new facility or court), he was surrounded by federal marshals. Awadallah was also usually placed in a "three-piece suit," which is "a set of leg restraints, a belly chain, and a set of handcuffs looped through the belly chain so that the hands are restrained at the person's waist." Tr. at 685.

"Awadallah and other inmates who were at the New York MCC in connection with the investigation into the September 11th terrorist attacks were designated high-security inmates and handled in accordance with the procedures for such inmates."[7] Gov't Mem. at 28 n.39 (citing Tr. at 635–36, 651–52). "[T]he warden determined that

---

fact on disputed issues regarding the conditions of confinement.

5. From September 21 to September 27, Awadallah was imprisoned at the San Diego Metropolitan Correctional Center ("San Diego MCC"). On September 27, he was moved to the San Bernardino Central Detention Center ("San Bernardino") because that prison is used as a holding facility when prisoners are moved across the country. *See* Tr. at 573. On Friday, September 28, the government flew Awadallah to the Federal Transfer Center ("FTC") in Oklahoma City. *See id.* at 554, 646–47; GX 101 ¶¶ 11–12, 17. Finally, on Monday, October 1, Awadallah was transport-

ed to the New York Metropolitan Correctional Center ("New York MCC"). *See* Tr. at 554; GX 101 ¶¶ 12, 17.

6. Hamud testified that, prior to October 1st, he was unable to locate Awadallah on the National Inmate Locator. *See* Tr. at 776–80.

7. *See also* Tr. at 687 (U.S. Deputy Marshal Scott Shepard testifying: "[M]y understanding is that our office treats anyone who is brought in as a material witness regarding the September 11 or any of the other embassy bombing trial[s], or anything like that, is treated as a security risk.").

until [the MCC] had any concrete evidence from the FBI or other folks, that there was not a terrorist association or anything of that nature, that [the MCC] would have to keep [the material witnesses] separate[ ]" and special precautions would apply. Tr. at 636. Awadallah was therefore incarcerated in the SHU and kept in solitary confinement.[8] *See id.* at 617, 631–32, 641.

It was also decided "early on" that "[w]ith respect to all of the folks who were being brought in as material witnesses and under investigation for the World Trade Center attacks ... that [the MCC] would record their movements with a hand-held camera," a policy that the prison had previously used with the "African Embassy bombers." *Id.* at 621. Thus, Awadallah was videotaped by the guard whenever he left his cell. *See id.* at 1013–15. During this time, he was also strip-searched. *See id.* Moreover, Awadallah was not allowed any family visits or phone calls prior to his grand jury testimony.[9] *See id.* at 637–38, 1021.

With respect to Awadallah's allegations of physical abuse, the government states that "[t]here is no dispute that Awadallah had bruises on his upper arms as of October 4, 2001." Gov't Mem. at 30 (citations omitted). In addition, a Special Investiga-

tive Agent prepared a report that found Awadallah had "multiple [bruises] on arms, right shoulder, [and] both ankles," a cut on his left hand, and an unspecified mark near his left eye. GX 305 at 2. *See also* Tr. at 797.

Finally, as a devout Muslim, Awadallah only eats *halal* meat. But, even after receiving the prison's common-fare religious diet, Awadallah was never assured that it complied with his religious requirements (*i.e.*, the meat was slaughtered in a particular fashion).[10] *See* Tr. at 523. As a result, Awadallah refrained from eating any meat, or any food that touched the meat, throughout his incarceration. At times, this meant that Awadallah ate little or nothing the entire day. *See id.* at 1001 (Awadallah testifying that he only ate an apple during his 24–hour incarceration at San Bernardino).

## IV. THE GOVERNMENT EXCEEDED ITS AUTHORITY UNDER THE MATERIAL WITNESS STATUTE

■ Awadallah argues that he was "merely [a] cooperating witness[ ] being detained illegally under an abusive application of the material witness law." GX 503 at 10 (10/2/01 Hearing). The prosecution, however, claims that its power to detain

---

8. In addition, "emotions and tensions were running high throughout the prison with respect to other inmates" and it was determined that Awadallah would be placed "in jeopardy, if he were to be put in general population." Tr. at 636 (Leslie Owen, senior staff attorney, Federal Bureau of Prisons, testifying). Even if Awadallah's safety partially motivated the decision to place him in the SHU, the fact that Awadallah was placed in severe restraints when no other prisoners were around indicates that the authorities believed Awadallah was dangerous.

9. Before Awadallah reached the New York MCC, there was a policy that prohibited any material witness from making phone calls.

Once Awadallah arrived at the New York MCC, the government notes that "there were no land line telephones available" because of the September 11th attacks and the MCC was only able to keep "in contact with law enforcement agents and with the courts" by using "a handful of cell phones." *Id.* at 643. *See also id.* at 658, 1021.

10. For example, one Chaplain testified that the common-fare religious diet was "[p]robably not" *halal* in a strict sense of the word because the meals are also used to accommodate Jewish prisoners who must eat kosher food. Tr. at 522.

material witnesses in connection with a grand jury investigation is authorized by section 3144, which states in pertinent part "[i]f it appears from an affidavit filed by a party that the testimony of a person is material *in a criminal proceeding ...*" 18 U.S.C. § 3144 (emphasis added). A critical question is the meaning of the term "criminal proceeding." Does it apply only in the pretrial context, after someone has been indicted? Or does that term also include grand jury proceedings which consider whether any indictments should issue?

### A. The Statute's Structure

#### 1. Sections 3144 and 3142

Although the phrase "criminal proceedings" may create some uncertainty, "[t]he statute's structure clarifies any ambiguity inherent in its literal language."[11] *Castillo et al. v. United States*, 530 U.S. 120, 124, 120 S.Ct. 2090, 147 L.Ed.2d 94 (2000) (turning first to the statute's structure to

determine the meaning of ambiguous terms). The material witness statute begins: "If it appears from an affidavit filed by a party...." 18 U.S.C. § 3144. "[B]y a party" plainly invokes an adversarial process—a proceeding where there is a prosecutor and a defendant and in which either side may submit an affidavit stating why a particular witness is material to its case.

■ In contrast, there are no parties to a grand jury proceeding. "The grand jury is an investigatory body. Until it completes its job, the criminal process *cannot begin*." *In re Schmidt*, 775 F.2d 822, 824 (7th Cir.1985) (emphasis added). *See also Branzburg v. Hayes et al.*, 408 U.S. 665, 688, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) ("Because [the grand jury's] task is to inquire into the existence of *possible* criminal conduct and to return only well-founded indictments, its investigative powers are necessarily broad.") (emphasis added).[12] A "party" to a criminal proceeding

---

11. The ambiguity of a particular word or phrase—standing alone—is not unusual because "words are not born with meanings. Words take their meaning from contexts, of which there are many...." Frank H. Easterbrook, "Text, History, and Structure in Statutory Interpretation," 17 *Harv. J.L. & Pub. Pol'y* 61, 61 (1994). *See also Comm'r of Internal Rev. v. Nat'l Carbide Corp.*, 167 F.2d 304, 306 (2d Cir.1948) ("[W]ords are chameleons, which reflect the color of their environment.") (Hand, J.). In *Bailey v. United States*, 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), for example, the Supreme Court illustrated that the word "use" can mean different things even in the same sentence: "I use a gun to protect my house, but I've never had to use it." *Id.* at 148–49, 116 S.Ct. 501. Likewise, "the word 'bill' may refer to evidence of indebtedness, to currency, to a petition, to a person's name, to the anatomy of a bird, a portion of a cap and a host of other objects...." 2A Norman J. Singer, *Statutes and Statutory Construction* 13, § 45:02 (6th ed.2000). Courts must therefore rely on "[t]he fundamental principle of statutory construction (and, indeed, of language itself) that

the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used." *Deal v. United States*, 508 U.S. 129, 132, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993). *See also King v. St. Vincent's Hosp.*, 502 U.S. 215, 221, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991) (invoking "the cardinal rule that a statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context.") (citation omitted).

12. The purpose of the grand jury is also to protect individuals from the vast power of the government:

Historically, (the grand jury) has been regarded as a primary security to the innocent against *hasty, malicious and oppressive persecution;* it serves the invaluable function in our society of standing between the accuser and the accused ... to determine whether a charge is founded upon reason *or was dictated by an intimidating power or by malice and personal ill will.*

*Branzburg*, 408 U.S. at 687 n. 23, 92 S.Ct. 2646 (quoting *Wood v. Georgia*, 370 U.S. 375,

does not exist until *after* the grand jury has returned an indictment.

■ Consider, for example, the affidavit issued in this case. "The warrant was issued based on the affidavit signed by New York FBI Special · Agent William Ryan Plunkett." Gov't Mem. at 17 (citing Tr. at 550, 937–39, 947–49; Plunkett Aff.). But Agent Plunkett was not a party to the grand jury proceeding—at best, Agent Plunkett was, like Awadallah, a witness before the grand jury. It was thus improper, under the plain language of the statute, for him to sign the· affidavit seeking .Awadallah's detention as a material witness. In fact, even after the perjury indictment issued, Agent Plunkett's status did not change because only the United States (as represented by the U.S. Attorney) and Awadallah (as represented by his counsel) are parties to these criminal proceedings.

■ Moreover, section 3144 does not apply to every witness that the parties may wish to call at a criminal proceeding; it only applies to those whose testimony is *material.* Although there is no fixed definition of when a witness's testimony is "material," in the context of a pending trial it is obvious that the judge must "determin[e] the importance of the witness to the case." Ronald L. Carlson and Mark S. Voelpel, "Material Witness and Material Injustice," 58 *Wash. U.L.Q.* 1, 21 (1980). Witnesses who are insignificant to the prosecution or defense may not be detained, even if they might be unavailable for trial.

In the context of a grand jury investigation, it is very difficult, if not impossible, for a judge to determine who is a material witness. The grand jury operates in secret and courts are generally prohibited from inquiring into its proceedings. *See*

390, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962))

Fed.R.Crim.P. 6(e)(2). Because there is no reasonable way to determine whether a witness's testimony is material to the grand jury investigation, a court·would be forced to rely on "a mere statement by a responsible official, such as the United States Attorney." *Bacon v. United States,* 449 F.2d 933, 943 (9th Cir.1971). But if a judge abdicates her role by delegating her authority to the government, she reads the materiality requirement out of the statute.

Section 3144 continues by stating that "a judicial officer may order the arrest of 'the person and treat the person in accordance with the provisions of section 3142 of this title." 18 U.S.C. § 3144. In turn, section 3142 explicitly states that it applies to proceedings "pending trial":

> (a) In general.—Upon the appearance before a judicial officer of a person charged with an offense, the judicial officer shall issue an order that, *pending trial,* the person be [released or detained].

18 U.S.C. § 3142. Given that a trial is not pending when a grand jury investigation is initiated to investigate potential criminal acts, it is plain that section 3142 cannot apply to grand jury proceedings.

Moreover, in determining whether to detain a defendant or witness pending trial, section 3142 mandates that "[t]he judicial officer shall ... take into account the available information concerning,"

> (1) The nature and circumstances of the offense charged ...;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person ...;
>
> (4) the nature and seriousness of the danger to any person ... that would be posed by the person's release....

(alterations in original) (emphasis added).

18 U.S.C. § 3142(g)(1)-(4). Weighing these factors is useful only if there is a defendant—that is, if an offense has been charged and trial is pending.

As for the first two factors, it makes sense that the more serious the "offense *charged,*" the more important will be society's interest in obtaining the witness's testimony. 18 U.S.C. § 3142(g)(1) (emphasis added). Conversely, when "the weight of the evidence *against* [the defendant]" is very strong, it will not be as critical to detain the witness. 18 U.S.C. § 3142(g)(2) (emphasis added). After all, if the witness absconds, the prosecution can proceed with its other evidence. Similarly, the last factor—"the nature and seriousness of the danger to any person . . . posed by the person's release"—becomes an important consideration when there is a pending trial because there is a real concern that the defendant will threaten the witness.[13] 18 U.S.C. § 3142(g)(4).

Applying section 3144 to a grand jury proceeding is an attempt to fit a square peg into a round hole. In order for the statute to make sense, a court must not only ignore pertinent portions of the statute but also add language—as this case well illustrates. On September 26, 2001, the Magistrate Judge in San Diego issued "written findings of fact and a written statement of the reasons for the detention"

as required by 18 U.S.C. § 3142(i)(1). *See* GX 505. In considering the "nature and circumstances of the offense charged," the Order reads:

> The material witness is not charged with committing any crime. There is, however, probable cause to believe he possesses material information in connection with a crime of horrific violence, the September 11, 2001, terrorist attack on the Pentagon. . . . [T]his factor weighs in favor of detention.

*Id.* at 2. The Order further states that "[t]he weight of the evidence is not applicable as the material witness is not charged with a crime. . . ." *Id.*

The Magistrate Judge ignored the plain language of the material witness statute, which requires the court to consider the "offense *charged.*" 18 U.S.C. § 3142(g)(1) (emphasis added). In order to justify Awadallah's detention as a material witness, prior to the return of any indictment, the judge added a new standard of "probable cause to believe he possesses material information". GX 505 at 2. This standard does not appear in the statute. In addition, the Order fails to address the fourth factor that the statute *requires* a judge to consider—"the nature and seriousness of the danger to any person . . . that would be posed by the person's release." 18

---

**13.** It is believed that "the original purpose behind material witness proceedings was to obtain the protective custody of a witness pending trial." Stacey M. Studnicki, "Material Witness Detention: Justice Served or Denied?", 40 *Wayne L.Rev.* 1533, 1544 (1994) ("Material Witness Detention") (citation omitted). "Consequently, the procedure is more likely to be used when the protection of the witness is at issue." *Id. See also Barry v. United States ex rel. Cunningham,* 279 U.S. 597, 618, 49 S.Ct. 452, 73 L.Ed. 867 (1929) ("The rule is stated by Wharton, 1 Law of Evidence, § 385, that where suspicions exist that a witness may disappear, or *be spirited away,* before trial, in criminal cases . . . he

may be held to bail to appear *at the trial* and may be committed on failure to furnish it.") (emphasis added); 8 *Moore's Federal Practice* ¶ 46.11 (2d ed. 1968) ("Treating a material witness like an accused under the Bail Reform Act—which favors release and not detention—obviously defeats the original purpose of material witness proceedings which was to obtain *protective custody* of the witness *pending trial.* Whether or not the draftsmen intended to nullify the practical benefit to the prosecution from such proceedings, their result is a salutary one, because of the potential for abuse inherent in former practice.") (first emphasis in original, second emphasis added).

U.S.C. § 3142(g)(4). *See also* 18 U.S.C. § 3142(g) (stating that the "the judicial officer *shall* ... take into account [such information].") (emphasis added).

Thus, The September 26th Order illustrates that the material witness statute can only be made to fit the context of a grand jury investigation by twisting the meaning, or ignoring altogether, three of the four factors that the court is obligated to consider.[14] Yet, as then-Professor, and later Attorney General of the United States, Edward Levi once wrote: "[T]he words of a statute are not dictum.... Not only respect but *application* is due to the general words the legislature used." Edward H. Levi, *An Introduction to Legal Reasoning* 28 (1949) (emphasis added).

Finally, as I noted in my previous opinion, "[u]nder the plain language of the statute, the government must show why the witness [detained under section 3144] should not be released, with or without the taking of his deposition" pursuant to Rule 15 of the Federal Rules of Criminal Procedure. *Awadallah II*, 2002 WL 123478, at *30. *See also* 18 U.S.C. § 3144 ("No material witness may be detained ... if the testimony of such witness can adequately be secured by deposition, and if further detention is not necessary to prevent a failure of justice."). The government concedes that "[t]he purpose of the provision [in section 3144] regarding depositions is that, '[w]henever possible, the depositions of [material] witnesses should be obtained so that they may be released from custody.'" Gov't Mem. at 67 (quoting S.Rep. No. 98–225, at 30 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3211–12) (alteration in original). Nonetheless, it argues:

> The deposition provision of § 3144 does not apply here.... [T]he provision is

meant to address the detention of material witnesses in the pretrial, as opposed to the grand jury, context. Indeed, the provision makes explicit reference to the taking of depositions in accordance with the Federal Rules of Criminal Procedure, and Rule 15, regarding depositions, addresses depositions in lieu of *trial* testimony in the pretrial context, after charges have been initiated. Thus, the rule contemplates the taking of depositions on notice to the opposing party; no such "opposing party" exists until criminal charges against a defendant have been filed.

*Id.* (emphasis in original). The government is correct to emphasize the difference between detaining witnesses "in the pretrial, as opposed to the grand jury, context." *Id.* The inherent differences between pretrial proceedings and grand jury investigations are as critical as they are obvious (*e.g.,* there are no opposing parties in an investigation). But this only shows that Congress could not have intended that this statute would apply to both pretrial and grand jury proceedings.

### 2. Federal Rules of Criminal Procedure

An examination of the two Federal Rules of Criminal Procedure that relate to the material witness statute provide further evidence that section 3144 cannot apply to grand jury proceedings. First, Rule 46 states:

> Rule 46. Release from Custody
>
> (a) *Release Prior to Trial.* Eligibility for release prior to trial shall be in accordance with 18 U.S.C. §§ 3142 and 3144.

---

14. "Going to Section 3142(g), I note that some of the factors to be considered don't appear to be directly applicable." GX 502 at 124 (Magistrate Judge Brooks at 9/25/01 Detention Hearing).

(b) *Release During Trial.* A person released before trial shall continue on release during trial under the same terms and conditions as were previously imposed unless the court determines that other terms and conditions or termination of release are necessary to assure such person's presence during the trial or to assure that such person's conduct will not obstruct the orderly and expeditious progress of the trial.

Fed.R.Crim.P. 46(a)-(b). Under Rule 46, the only statutes that address "Release from Custody" are sections 3142 and 3144, and those statutes only refer to release prior to *trial. See INS et al. v. Nat'l Ctr. for Immigrants' Rights, Inc. et al.,* 502 U.S. 183, 189, 112 S.Ct. 551, 116 L.Ed.2d 546 (1991) ("[T]he title of a statute or section can aid in resolving an ambiguity in the legislation's text.").

The other rule that cross-references section 3144 also relates to procedures in contemplations of a trial. Rule 15 states:

Depositions(a) When Taken. Whenever due to exceptional circumstances of the case it is in the interest of justice that the testimony of a *prospective witness of a party* be taken and preserved for use *at trial,* the court may upon motion of such party and notice to the parties order that testimony of such witness be taken by deposition and that any designated book, paper, document, record, recording, or other material not privileged, be produced at the same time and place. *If a witness is detained pursuant to section 3144 of title 18,* United States Code, the court on written motion of the witness and upon notice to the parties

may direct that the witness' deposition be taken. After the deposition has been subscribed the court may discharge the witness.

Fed.R.Crim.P. 15(a) (emphasis added). This Rule falls under the general section of the Federal Rules entitled "Arraignment and Preparation For Trial," and specifically refers to a "prospective witness of a party" which must be "taken and preserved for use at trial." *Id.* There is no mention, whatsoever, of grand jury witnesses. Meanwhile, the only Rule of Criminal Procedure that explicitly applies to the grand jury, Rule 6, makes no mention of section 3144 or how and when courts may detain grand jury witnesses.

### 3. The Statutory Scheme of The Bail Reform Act of 1984

■ "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Michigan Dep't of Treasury,* 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989).[15] Section 3144 is contained in chapter 207 of the United States Code, entitled "Release and Detention Pending Judicial Proceedings." That chapter, enacted as the Bail Reform Act of 1984, contemplates only two situations in which a judicial officer is authorized to release or detain an individual: (1) "Pending trial," 18 U.S.C. § 3141(a) and (2) "Pending sentence or appeal," 18 U.S.C. § 3141(b). There is no mention of a grand jury investigation anywhere in the Act.

**15.** *See also Robinson v. Shell Oil Co.,* 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."); *Bailey,* 516 U.S. at 145, 116 S.Ct. 501 ("We consider not only the bare meaning of the word but also its placement and purpose in the statutory scheme.").

■ The Act also addresses punishment for "failure to appear" and states: "Whoever, having been released under this chapter knowingly ... fails to appear *before a court* ... shall be punished as provided [by the statute]." 18 U.S.C. § 3146 (emphasis added). It is also true that "if the person was released for appearance as a material witness, [he may be punished for failure to appear by] a fine under this chapter or imprisonment for not more than one year, or both." 18 U.S.C. § 3146(b)(1)(B). Because a grand jury has never been viewed as "a court," the statute does not apply to a witness who has failed to appear before a grand jury.[16]

## B. Legislative History

### 1. Bail Reform Act of 1966

The bedrock of the current material witness statute was formed with the enactment of the Bail Reform Act of 1966.[17] After several years of study and, in the words of one congressman, "historic hearings .... [on] a proposal to modernize the pretrial release system in our Federal courts," Congress passed 18 U.S.C. § 3149.[18] House Hearings at 15–16. That section reads as follows:

> If it appears by affidavit that the testimony of a person is material in any criminal proceeding, and if it is shown that it may become impracticable to secure his presence by subpoena, a judicial officer shall impose conditions of release pursuant to section 3146 [18 U.S.C. § 3146]. No material witness shall be detained because of inability to comply with any condition of release if the testimony of such witness can adequately be secured by deposition, and further detention is not necessary to prevent a failure of justice. Release may be delayed for a reasonable period of time until the deposition of the witness can be taken pursuant to the Federal Rules of Criminal Procedure.

18 U.S.C. § 3149 (1966) (repealed 1984), Pub.L. No. 89–465, 80 Stat. 214 (1966).

Although the legislative history shows that Congress was primarily concerned with setting new bail standards for defendants awaiting trial, Congress also considered how and when to detain material

16. It is also notable that 28 U.S.C. § 1821(d)(4) provides: "When a witness is detained pursuant to section 3144 of title 18 for want of security for his appearance, he shall be entitled for each day of detention when *not in attendance at court*, in addition to his subsistence, to the daily attendance fee provided by subsection (b) of this section [which is $40 per day, 28 U.S.C. § 1821(b)]." (Emphasis added). The statute shows, once again, that when Congress explicitly has considered section 3144, it has only been "in the pretrial, as opposed to the grand jury, context." Gov't Mem. at 67. Nothing in the record indicates that the government has attempted, or considered, reimbursing Awadallah for "each day of detention" prior to his grand jury testimony. 28 U.S.C. § 1821(d)(4).

17. The legislative history of the Bail Reform Act of 1966 may be found in the following hearings and reports: *Federal Bail Reform: Hearings Before Subcomm. No. 5 of the House Comm. on the Judiciary*, 89th Cong. 1–90 (1966) ("House Hearings"); *Federal Bail Procedures: Hearings Before the Subcomm. on Improvements in the Judiciary and the Subcomm. on Constitutional Rights of the Senate Comm. on the Judiciary*, 89th Cong. 1–322 (1965) ("Senate Hearings"); *S. Rep.* No. 89–750, at 1–27 (1965); *H.R. Rep.* No. 89–1541, at 1–25 (1966).

18. The hearings were also unprecedented. *See* House Hearings at 20 ("Not since the First Congress enacted the Judiciary Act of 1789 and several months later approved the eighth amendment has there been a detailed study by the Congress of the bail systems's impact on the release or detention of criminal defendants in the Federal courts.") (Statement of Ramsey Clark, Deputy Attorney General).

witnesses. As the legislative history makes clear, Congress only discussed the statute in the context of a pending trial. Opening the House Hearings, Chairman Emanuel Celler stated:

> The proposals ... provide the Federal judiciary and the Department of Justice with the necessary authority to release those who 'are entitled to release *pending trial,* regardless of their financial resources, and to set strict conditions, including the posting of money bail, on those who may be a menace to society if released before trial.

> The release procedure will also be applicable to a material witness who, under present law, can be held in jail *before trial* if he is unable to post bail while the defendant who can post bail is released.

House Hearings at 15 (Statement of Rep. Emanuel Celler) (emphasis added). At the Senate Hearings, Deputy Attorney General Ramsey Clark testified:

> Somewhat related is our proposed modification of S. 1357 to limit any detention of material witnesses. It would be ironic if a bill to encourage the release of alleged offenders failed to do at least the same for a person accused of nothing except knowledge about someone else's crime. If there is risk of a witness *not being available for trial,* his deposition ought to be taken to preserve his testimony.

Senate Hearings at 24 (emphasis added).[19] Indeed, all references to the material witness statute indicate that members of Congress and witnesses were solely focused on the problem of how to assure the appearance of individuals *in court* or *for a trial.*[20] There is not a single discussion about grand jury investigations.

The only reference to a grand jury in the legislative history is contained in a scathing paper submitted to the Senate which argued "there have been enough abuses of [material] witnesses ... to make the matter a serious one." Parle T. Blake et al., *The Treatment of a Material Witness in Criminal Proceedings,* Senate Hearings at 302. In providing "background," the paper stated:

> Generally, it has also been left to the courts in the several jurisdictions to define the type of criminal proceeding which must be pending to permit the application of the statutes. Decisions in this area are not uniform. "Criminal proceeding" has been held to include not only trials and grand jury proceedings but even the mere issuance of an arrest warrant.

*Id.* at 302 (citing *People ex rel. Van Der Beek v. McCloskey,* 18 A.D.2d 205, 238 N.Y.S.2d 676 (1st Dep't 1963) for the proposition that courts have held that a "criminal proceeding" could include grand jury

---

**19.** *See also* S.Rep. No. 89–750 at 19 (indicating that the bill was changed because "[a] number of witnesses felt that material witnesses should be treated separately and that the bill should contemplate that detention of such persons should be ordered only when *clearly necessary.*") (emphasis added).

**20.** Other references to material witness detention may be found in the following places: House Hearings at 30 (Mr. Clark testifying that "[i]t is fairly infrequent" to detain material witnesses although it is done more often with "an area like organized crime" with the

primary purpose of protecting the witness); Senate Hearings at 93 (Lawrence Speiser testifying that he had read Mr. Clark's testimony that "indicates eliminating or revising the provisions for material witnesses") (Statement of Lawrence Speiser, Director, American Civil Liberties Union, Wash., D.C.); House Report at 15 (explaining the proposed bill, which would allow for the deposition of material witnesses "pursuant to the Federal Rules of Criminal Procedure, specifically, rule 15").

investigations).[21]

Far from an endorsement, however, the paper argued that the material witness statutes were constitutionally unsound. *See id.* at 300 ("It is strange that a system of laws such as ours which exalts personal right and individual liberties should even permit the incarceration ... of one who is not even suspected of having violated those laws."). After discussing the prolonged detention of witnesses in prisons, the denial of counsel and the lack of an appeal, *see id.* at 304–05, the paper concluded: "The only entirely satisfactory reform of the present system would be for every State and the Federal Government to return to the more rational and equitable common law rule and require release of all material witnesses on their personal recognizance." *Id.* at 306. "Should such a sweeping reform prove too revolutionary, there are other improvements which, although less satisfactory, nevertheless recommend themselves highly." *Id.* Such improvement included: "[W]here the accused is not known or has not been apprehended the witness should *never* be detained, especially where he is the complaining witness." *Id.* at 307 (emphasis added).

## 2. Commentary on Material Witness Statute Before and After the Bail Reform Act of 1966

Given that the legislative history of the Bail Reform Act of 1966 only condones the detention of material witness pending trial, it is not surprising that commentary published prior to the Act reflects an understanding of the problems raised by detaining innocent people as material witnesses *only* in this context. *See* Joshua Casula & Morgan Dowd, "The Plight of the De-

tained Material Witness," 7 *Cath. U.L.Rev.* 37, 37 (1958) ("Until recently the material witness who had been detained in jail *awaiting trial* has received little or no consideration.") (emphasis added); *id.* ("The inability of the state to produce a witness *at the trial* ... may often be fatal to the case. To ensure the presence of the witness, states have adopted ... detention *until trial* if the recognizance cannot be met.") (emphasis added); Robert O. Coyle, "Confining Material Witnesses in Criminal Cases," 20 *Wash. & Lee L.Rev.* 164, 164 (1963) ("Since the presence of a particular material witness may be essential to the prosecution of a criminal case, some means must be used to assure his attendance *at the trial* .... [T]he prosecution may ask for his confinement or at least his giving of a bond. Then the appropriate court will be confronted with the question of when a material witness may be confined *to await trial* ....") (emphasis added); Maximiliam Koessler, "Arrest as Material Witness," 69 *Case & Comment* 28, 30 (1964) ("It has been said that statutes conferring the power to arrest a person as a material witness be justified by necessity, and are a means reasonably to secure the appearance of key witnesses *at criminal trials*.") (emphasis added). Indeed, one commentator referred to the rule used in federal courts by stating:

In most jurisdiction[s], the procedure by which surety is required of witnesses is one-sided. There is no challenge to the district attorney's certification.... An example of this is Federal Rule of Criminal Procedure 46(b), which requires ... that "it *may* become impracticable to secure his presence by subpoena." (Emphasis added). What does this last phrase mean? The only germane cita-

---

**21.** *But cf.* Note, "Detention of Material Witnesses Under Section 618–b of the New York Code of Criminal Procedure," 5 *Syracuse L.Rev.* 213, 218 (1953–54) ("The main pur-

pose of Section 618–b is to insure the presence of a material witness *at the trial* of the action in connection with which he is being held.") (emphasis added).

tion in the annotated rules says that "it is always within [the district attorney's] power, under the law, where the person is within the jurisdiction of the court, and *he doubts* whether he will be present *on the trial* of the cause, to compel him to give security that he will be present *at the trial . . . ."*

Roger A. Lowenstein, "Detention of Material Witnesses in Criminal Cases," 2 *Harv. C.R.-C.L. L.Rev.* 115, 118 (1966–67) (quoting *United States v. Durling,* 25 F.Cas. 944 (N.D.Ill.1869)) (first two emphases in original, last two emphases added).

Commentary published after the passage of section 3149 continued to discuss the detention of material witnesses in the same vein: "Implicitly the requirement of bail or detention assumes, either expressly or covertly, that a subpoena backed by the threat of imprisonment for contempt is inadequate to guarantee the attendance of a witness *at trial."* Comment, "Pretrial Detention of Witnesses," 117 *U. Pa. L.Rev.* 700, 700 (1969) (emphasis added). *See also* Ronald L. Carlson, "Jailing the Innocent: The Plight of the Material Witness," 55 *Iowa L.Rev.* 1, 5 (1969) ("Although the new federal law does not eliminate the possibility that witnesses to federal crimes will be deprived of their freedom, it does signal a shift in emphasis and contains significant provisions designed to restrict *pre-trial* incarceration . . . .") (emphasis added); *id.* at 15 ("Some of the courts approving detention of witnesses have urged that if witnesses without funds were exempt from imprisonment *until trial,* there would be nothing to insure the attendance of the witness when required.") (emphasis added); Daniel W. Henry, "The Wetback as Material Witness: Pretrial Detention or Deposition?" 7 *Cal. W.L.Rev.* 175, 180 (1970) ("In considering the advisability of incarceration of witnesses in general, *pending trial* of the defendant, many arguments both for and against such procedure

may be made . . . . [including] [t]he witness' presence *at trial* is essential 'to prevent a failure of justice.' ") (quoting 18 U.S.C. § 3146) (emphasis added); Ronald L. Carlson and Mark S. Voelpel, "Material Witness and Material Injustice," 58 *Wash. U. L.Q.* 1, 9 (1980) ("The material witness detention process has not always been used for its intended purpose—to secure live testimony *for trial.*") (emphasis added).

### 3. The Bail Reform Act of 1984

In 1984, Congress amended the material witness statute by replacing section 3149 with section 3144 (the current statute) as part of the Comprehensive Crime Control Act of 1984, Pub.L. 98–473, 98 Stat.1976 (1984). The statute was amended as follows:

> If it appears ~~by~~ *from an* affidavit *filed by a party* that the testimony of a person is material in ~~any~~ criminal proceeding, and if it is shown that it may become impracticable to secure ~~his~~ *the* presence *of the person* by subpoena, a judicial officer ~~shall impose conditions of release pursuant to section 3146~~ *may order the arrest of the person and treat the person in accordance with the provisions of section 3142 of this title.* No material witness ~~shall~~ *may* be detained because of inability to comply with any condition of release if the testimony of such witness can adequately be secured by deposition, and *if* further detention is not necessary to prevent a failure of justice. Release *of a material witness* may be delayed for a reasonable period of time until the deposition of the witness can be taken pursuant to the Federal Rules of Criminal Procedure.

*Compare* 18 U.S.C. § 3144 (1984) *with* 18 U.S.C. § 3149 (1966).

"The provisions for material witnesses in the Bail Reform Act of 1984, 18 U.S.C.A. § 3144, are not significantly different from those in the prior statute." Charles A. Wright, 3A *Fed. Prac. & Proc.Crim.2d* ("*Wright & Miller Treatise*") § 776 (2002 pocket part). In fact, according to the published legislative history, "[t]his section *carries forward*, with two significant changes, current 18 U.S.C. [§ ] 3149 which concerns the release of a material witness." S.Rep. No. 98–225, at 28 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3211 (emphasis added). "The first change in current law is that, in providing that a material witness is to be treated in accordance with section 3142, section 3144 would permit the judicial officer to order the detention of the witness if there were no conditions of release that would assure his appearance." *Id.* "This cured the ambiguous language in the repealed statute which *required* the conditional release of the witness in the same manner as a defendant awaiting trial." "Material Witness Detention," 40 *Wayne L.Rev.* at 1538 n.32 (emphasis added). *See also* 18 U.S.C. § 3149 (1966) (stating "a judicial officer *shall* impose conditions of *release* pursuant to section 3146 . . . .") (emphasis added). "The other change . . . [was] to grant the judicial officer not only the authority to set release conditions for a detained material witness . . . but to authorize the arrest of the witness in the first instance." 1984 U.S.C.C.A.N. at 3211. "To cure this ambi-

guity," the Senate Committee "added to section 3144 (the successor to 18 U.S.C. [§ ] 3149) specific language authorizing the judge to order the arrest of a material witness." *Id.* at 3212.

## C. Conflicting Authority—*Bacon v. United States*

The Ninth Circuit's decision in *Bacon v. United States*, 449 F.2d 933 (9th Cir.1971), is the *only* authority for the proposition that the material witness statute permits a court to detain a witness for the purpose of testifying before a grand jury:[22] Not surprisingly, the government cites *Bacon* seven times for the proposition that its arrest of Awadallah was lawful. *See* Gov't Mem. at 54, 61, 63 n.63, 65 n.65, 77 n.69; Reply Mem. at 19, 22. However, *Bacon* does not determine the outcome in this case for three reasons: (1) *Bacon's* holding is not binding on this Court; (2) the propositions relied on by the government are clearly *dicta;* and (3) *Bacon* is wrong.

### 1. The Facts and Holding of *Bacon*

The pertinent facts and outcome of *Bacon* are straightforward. "On April 22, 1971, the United States Attorney for the Western District of Washington swore out a material witness complaint" before the district court. *Bacon*, 449 F.2d at 934. The complaint alleged that Leslie Bacon "had personal knowledge of matters material to a grand jury investigation and that a subpoena would be ineffective in secur-

---

**22.** A review of the case law has revealed no other opinion that has addressed whether a material witness may be detained in conjunction with a grand jury investigation. However, in *United States v. Seif*, No. 01 Cr. 977, 2001 WL 1415034, at *4 (D.Ariz. Nov.8, 2001), the magistrate judge touched upon this issue when denying bail in a case related to the September 11th attacks. The judge found that the defendant, who was charged with making false statements on his applications to the Social Security Administration and the

Federal Aviation Administration, was a flight risk because, among other things, he might be afraid that the "the Government may choose, at a minimum, to hold him as a material witness *if* multiple counts of conspiracy to commit murder, likely capital offenses, and other serious crimes *were filed* related to the September 11th terrorist attacks," seemingly recognizing that the material witness statute only applies in the pretrial context (*i.e.*, once an indictment has issued). *Id.* (emphasis added).

ing her presence." *Id.* "Relying solely on that complaint," the district court "issued an order commanding the United States Marshal to arrest Bacon and to transport her to Seattle in his custody unless she posted bail of $100,000.00." *Id.* at 934–35. On April 27, FBI agents "transferred [Bacon] to the custody of the United States Marshal in lieu of bond in the amount set by the [district court]." *Id.* at 935. Bacon subsequently filed a petition for a writ of habeas corpus challenging the detention, which the district court denied. *See id.*.

On appeal, the Ninth Circuit reversed. "Such an arrest as we have here," the Ninth Circuit stated, "has no history of judicial or public acceptance." *Id.* at 942. The court concluded that the "writ was erroneously denied" because there was no showing of "probable cause" to support the finding that "Bacon could not practicably be brought before the grand jury by a subpoena." *Id.* at 945. Accordingly, the court reversed the order "with directions to quash the warrant of arrest, including the order fixing bail." *Id.*

### 2. *Bacon's* Discussion of Detention Under the Material Witness Statute Is *Dicta*

*Bacon* is remarkable for its unnecessary discussion—much of which is confused if not tortured—about whether grand jury witnesses may be lawfully detained. Bacon had argued that "the government has no power to assure the attendance of grand jury witnesses by arrest and deten-

tion before disobedience of a subpoena." *Id.* at 936. *First,* she claimed that neither section 3149 nor Rule 46 expressly granted to the court the power to arrest or detain a witness because they only provided for a witness' release. *See Bacon,* 449 F.2d at 939; *see also* 18 U.S.C. § 3149 (1966) ("a judicial officer shall impose conditions of *release* . . . .") (emphasis added). *Second,* although "[b]oth § 3149 and Rule 46(b) apply expressly to 'any criminal proceeding,'" Bacon argued "that a grand jury investigation is not a 'criminal proceeding'" and therefore she could not be detained for having information allegedly pertinent to a grand jury investigation. *Bacon,* 449 F.2d at 939. *Third,* "Bacon further claim[ed] that arrest and detention of material witnesses, not suspected of wrongdoing, is forbidden by the Constitution." *Id.* at 941.

The court rejected each of these arguments and granted the petition on another ground. Thus, all of *Bacon's* discussion as to the applicability of the material witness statute to grand juries was unnecessary to the court's holding and therefore *dicta.* *See, e.g., United States v. Henderson,* 961 F.2d 880, 882 (9th Cir.1992) (defining *dicta* as language that is "unnecessary to [the court's] holding").[23]

### 3. The Problems with *Bacon's* Statutory Interpretation

 Careful scrutiny of the panel's statutory interpretation in *Bacon* reveals

---

**23.** *See also United States v. Bell,* 524 F.2d 202, 206 n. 4 (2d Cir.1975) ("Even viewing it as well-considered or judicial dictum [by the Supreme Court], we are not necessarily bound to follow it."). *But compare Spears v. Stewart,* 283 F.3d 992, 998–99 (9th Cir.2002)(Reinhardt, J., dissenting from denial of rehearing en banc) ("The panel's statement . . . is clearly unnecessary to its resolution of the case, does not affect its outcome in any manner, and constitutes an advisory opin-

ion. . . . The contents of that portion of the panel opinion are entirely dicta.") *with id.* at 1006–07 (Kozinski, J., filing statement concerning denial of petitions for rehearing en banc) ("[S]o long as the issue is presented in the case and expressly addressed in the opinion, that holding is binding and cannot be overlooked or ignored by later panels of this court or by other courts of the circuit. . . . . Let no one be misled by Judge Reinhardt's ruminations to the contrary.").

that it is fundamentally flawed for a simple reason: A court may not rewrite legislation. The only job of a court is to interpret a statute as it is written and assess its constitutionality. Under our Constitution, it is the legislature that weighs the policy concerns for and against enacting certain laws, which courts then construe and apply. "While the judicial function in construing legislation is not a mechanical process from which judgment is excluded, it is nevertheless very different from the legislative function." *Addison v. Holly Hill Fruit Products,* 322 U.S. 607, 618, 64 S.Ct. 1215, 88 L.Ed. 1488 (1944). "Construction is not legislation and must avoid 'that retrospective expansion of meaning which properly deserves the stigma of judicial legislation.'" *Id.* (quoting *Kirschbaum Co. v. Walling,* 316 U.S. 517, 522, 62 S.Ct. 1116, 86 L.Ed. 1638 (1942)). The court in *Bacon* disregarded this fundamental principle.

### (a) The Power to Arrest or Detain a Witness

The *Bacon* court began its analysis by noting that neither section 3149 nor Rule 46(b) expressly granted the power to arrest or detain a material witness. *See Bacon,* 449 F.2d at 937. Nonetheless, the court looked to the "legislative history of the Bail Reform Act of 1966" as well as the "the legislative and statutory history of Rule 46(b)" to "support the proposition that a power to arrest should be implied." *Id.* at 937–38. It reasoned that, because "[t]he uninterrupted existence from 1789 to 1948 of legislative authority to arrest and detain material witnesses does not appear to have been broken" by subsequent statutory developments, "a grant of power to arrest material witnesses can fairly be inferred from Rule 46(b) and from § 3149 as well." *Id.* at 937.

### (b) "Criminal Proceeding"

In response to Bacon's argument "that a grand jury investigation is not a 'criminal proceeding'" under section 3149 and Rule 46(b), the court disregarded the plain language and legislative history of the statute to extend the material witness statute to grand jury proceedings. *Id.* at 939. To begin, the court noted that "the term 'criminal proceeding,' absent a clear context, is ambiguous." *Id.* This observation is unremarkable, and it is only to be expected that "[a]mong the courts that have wrestled with its meaning in *various* contexts, there is a division of opinion as to whether grand jury investigations are included [as part of 'criminal proceedings']." *Bacon,* 449 F.2d at 939 (citing *United States v. Thompson,* 319 F.2d 665, 668 (2d Cir.1963) (collecting cases)) (emphasis added). *See also supra* note 11.

But *Bacon* was paying lip service to the theory that words take their meaning from their context, because the court never actually examined the context of section 3149 or Rule 46(a). Instead, the court analyzed section 3771 of Title 18 and held that "the Statutory authorization for the Rules extends to the promulgation of rules governing the grand jury." *Bacon,* 449 F.2d at 940. Having stated this self-evident proposition, the court went on to explain that "[t]here remains the question whether the Supreme Court has exercised to the fullest the authority granted. The Rules themselves indicate that the Court did." *Bacon,* 449 F.2d at 940. The court based this conclusion on the fact that:

> Rule 2 states that "[t]hese rules are intended to provide for the just determination of *every criminal proceeding.*" (Emphasis added.) Rule 6 authorizes the summoning of grand juries and establishes procedures to govern their operation, thereby evidencing the Court's belief that grand jury investigations are

criminal proceedings properly cognizable by the Rules of Criminal Procedure. Finally, Rule 17, which governs the subpoena power in criminal proceedings, was clearly intended to apply not only to criminal trials but to grand jury investigations as well.

*Id.* (alterations in original)

This reasoning is specious. Rule 2 does not define the phrase "criminal proceeding" as it is used throughout the Rules of Criminal Procedure; nor does it help determine whether a grand jury is (or is not) a proceeding that necessarily comes before the *initiation* of a "criminal proceeding" as used in Rule 46. Rule 6 may establish the procedures that control grand jury proceedings, but this cuts *against* the court's argument that Rule 46 should *also* apply to the summoning of grand jury witnesses. Rule 17 may apply to grand juries, but it does not mention "criminal proceedings". Rather, it states: "A subpoena shall be issued by the clerk under the seal of the court. It shall state the name of the court and the title, *if any,* of the *proceeding,* and shall command each person to whom it is directed to attend and give testimony at the time and place specified therein." Fed. R.Crim.P. 17(a).

Moreover, according to the logic of *Bacon,* if the term "criminal proceeding" includes grand juries under Rules 2, 6 or 17, then the reference to "criminal proceeding" in Rule 46 must also include grand juries. That assumption is preposterous because it would lead to the conclusion that all the Rules of Criminal Procedure, which "apply to all criminal proceedings," Fed.R.Crim.P. 54, extend to grand juries.[24]

The *Bacon* court next confronted the legislative history of Rule 46. The court conceded that "the Advisory Committee Note to Rule 46(b) expressly states that the Rule is 'substantially a restatement of existing [statutory] law.'" *Bacon,* 449 F.2d at 940. The former material witness statute, 28 U.S.C. § 659, stated:

> Any judge of the United States, on the application of a district attorney, and on being satisfied by proof that the testimony of any person is competent and will be necessary *on the trial* of any criminal proceeding in which the United States are parties or are interested, may compel such person to give recognizance, with or without sureties, at his discretion, to appear to testify therein....

28 U.S.C. § 659 (1928) (repealed 1948) (emphasis added).

However, the court was "unable to accept" the legislative history because it "should ... be hesitant to say that the Supreme Court *intended* Rule 46(b) to be so designed that federal law-enforcement agencies can be frustrated by the flight of a prospective witness whose testimony is indispensable to the securing of an indictment." *Bacon,* 449 F.2d at 940 (emphasis added). When there is clear evidence about the intent of the drafters, there is no reason to be "hesitant" as to what the drafters *intended. Id.* (recognizing that the Advisory Committee Note *"expressly* states that the Rule is 'substantially a restatement of existing law'") (emphasis added). The court's concern about the "indispensable" nature of witness testimony to the grand jury is irrelevant. "Whatever merits these and other policy arguments may have, it is not the province of [the courts] to rewrite the statute [or Rules] to accommodate them." *Artuz v.*

---

**24.** In fact, it is impossible to assign a consistent meaning to the phrase "criminal proceedings" throughout the Federal Rules of Criminal Procedure. The following Rules contain a reference to "criminal proceedings": 1, 7(c)(2), 11(e)(6), 12(a), 32.2(a), 50, 55, 59.

*Bennett,* 531 U.S. 4, 10, 121 S.Ct. 361, 148 L.Ed.2d 213 (2000).

To further support its decision to ignore the clear intent of Congress, the court insisted that "the disavowal by the Advisory Committee of any intent to alter existing law does not foreclose a consideration of what they did in fact." *Bacon,* 449 F.2d at 940. However, this approach to statutory construction—namely, the text of a statute always trumps legislative intent—is only applicable if a statute has a plain meaning. *See Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917) ("It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain ... the sole function of the courts is to enforce it according to its terms."). But, having insisted that the ambiguity in the statute required an examination of legislative history, the court should not have then turned around and ignored that history.[25]

Given its poor reasoning, *Bacon's* conclusion that Rule 46 allows courts to detain witnesses for grand jury investigations deserves no respect. Indeed, its conclusion is particularly troubling because the court never mentioned section 3149, the statute under which Bacon was arrested.

### (c) The Constitutional Question in *Bacon*

After judicially expanding the reach of the material witness statute, the *Bacon* court turned to the constitutionality of the statute. Faced with the "claim that arrest and detention of material witnesses, not suspected of wrongdoing, is forbidden by the Constitution," the court ducked the issue. *Bacon,* 449 F.2d at 941. "[Bacon] does not ... cite us to any provision of the Constitution which supports her claim, nor does she refer to any case authority."[26] *Id.* "Because this issue has been presented in a perfunctory manner, without adequate

---

25. Moreover, *Bacon* then engaged in unfettered speculation about the intent of the drafters stating, among other things, that: "It is unlikely that the drafters would provide for the arrest and detention of a material witness for a trial, but not for a grand jury." *Id.* Of course, from 1789 to 1948, Congress had continuously drawn the distinction between pretrial and grand jury proceedings, which *Bacon* found so unlikely. *See* Act of September 29, 1789, ch. 20, § 33, 1 Stat. 23, 91 ("That for any crime or offence against the United States, the offender may.. be arrested, and imprisoned or bailed, as the case may be, *for trial* .... And copies of the process shall be returned as speedily as may be into the clerk's office of such court, together with the recognizances of the witnesses for their appearance *to testify in the case* .... And if such commitment of the offender, or the witnesses shall be in a district other than that *in which the offence is to be tried,* it shall be the duty of the judge ... [to issue] a warrant for the removal of the offender, and the witnesses, or either of them, as the case may be, to the district *in which the trial is to be had."*) (emphasis added); Act of August 8, 1846, ch. 98, § 7, 9 Stat.

73, 73–74 ("That, on the application of any attorney for the United States for any district, and upon satisfactory proof of the materiality of the testimony of any person who shall be a competent witness, and whose testimony shall, in the opinion of any judge of the United States, be necessary upon *the trial* of any criminal cause or proceeding in which the United States shall be a party or interested, any such judge may compel such person ... to give recognizance ... to appear *on the trial of said cause or proceeding* and give his testimony therein; and, for that purpose, the said judge may issue a warrant against such person.. to arrest such person ....") (emphasis added); 28 U.S.C. §§ 657, 659 (1928) (quoted *supra* Part IV.C.3(b)), repealed in 1952.

26. Bacon can hardly be faulted for not citing a case given that "[t]here appear to have been no reported cases" after 1948 that involved detained material witnesses under Rule 46. *Wright & Miller Treatise* § 766. This is partially due to the fact that the federal statute was "infrequent[ly] [used]." House Hearings at 30 (Statement of Deputy Attorney General Clark).

briefing and argument, we decline to rule upon it at this time." *Id.*

 Whether a statute survives constitutional scrutiny cannot be brushed aside because of insufficient briefing. Determining whether a statute is constitutional is not only the exclusive province of the courts, it is also their exclusive *duty*. *See Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). Indeed, in *Marbury,* the Supreme Court held that a statute was unconstitutional, even though the issue was not raised by the parties.[27] When cast in this light, the *Bacon* court abdicated its judicial responsibility to assess the constitutionality of its own interpretation of the statute.

In any event, the *Bacon* court was not as ignorant about the Constitution as it claimed. On the same page of the opinion where the court declined to address the constitutionality of the statute, the court discussed the Fourth Amendment, the most obvious amendment that might be violated. *Bacon,* 449 F.2d at 942 n. 7 ("The Supreme Court has held that arrest of suspects by law enforcement officers are seizures of the person within the meaning of the Fourth Amendment."). Because Leslie Bacon was seized upon being arrested, the Fourth Amendment's mandate "against *unreasonable* ... seizures" was undoubtedly triggered. U.S. Const. amend. IV (emphasis added). Yet, the *reasonableness* of imprisoning a witness and transporting her across the country in order to facilitate a grand jury investigation was completely ignored.

## IV. AWADALLAH WAS UNLAWFULLY DETAINED AND HIS GRAND JURY TESTIMONY MUST BE SUPPRESSED

### A. "Criminal Proceeding" Has a Plain Meaning in the Context of Section 3144

 "In *U.S. Nat. Bank,* the Supreme Court emphasized that it has over and over ... stressed that [i]n expounding a statute, [the court] must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *Oregon v. Ashcroft,* 192 F.Supp.2d 1077, 1088–89 (D.Or.2002) (quoting *U.S. Nat. Bank of Or. v. Indep. Ins. Agents,* 508 U.S. 439, 455, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993)) (quotation marks omitted). When construed in context, the phrase "criminal proceeding" in section 3144 could not be clearer: Section 3144 only allows the detention of material witnesses in the pretrial (as opposed to the grand jury) context. Detaining Awadallah solely for the purposes of a grand jury investigations was therefore unlawful.

### B. Interpreting Section 3144 to Include Grand Juries Raises a Serious Constitutional Question

 Even if the statute could be interpreted, in the alternative, to include grand jury investigations, cardinal rules of statutory construction would preclude this Court from adopting such a constitutionally precarious interpretation. As the Supreme Court has explained: "[I]f an otherwise acceptable construction of a statute

---

**27.** "The theory of the Chief Justice that Section 13 of the old Judiciary Law was unconstitutional was absolutely new, and it was as daring as it was novel.... Nobody ever had questioned the validity of that section of the statute which Marshall now challenged." 3 Albert J. Beveridge, *The Life of John Marshall* 128 (1919). *See also Marbury,* 5 U.S. at 178, 1 Cranch 137 ("In some cases then, the constitution *must be* looked into by the judges. And if they can open it at all, what part of it are they forbidden to read, or to obey?") (emphasis added).

would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,' [courts] are obligated to construe the statute to avoid such problems." *INS v. St. Cyr*, 533 U.S. 289, 299–300, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (citations omitted). "This cardinal principle has . . . for so long been applied by [our courts] that it is beyond debate." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. and Constr. Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) (citations omitted).

Imprisoning a material witness for a grand jury investigation raises a serious constitutional question under the Fourth Amendment, which prohibits "unreasonable . . . seizures." U.S. Const. amend. IV. Because imprisonment constitutes a seizure, a key question is whether detaining grand jury witnesses is constitutional:

> To determine the constitutionality of a seizure we must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion. We have described the balancing of competing interests as the key principle of the Fourth Amendment. Because one of the factors is the extent of the intrusion, it is plain that reasonableness depends on not only when a seizure is made, but also *how it is carried out.*

*Tennessee v. Garner*, 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) (citations and quotation marks omitted) (emphasis added).

The only *legitimate* reason to detain a grand jury witness is to aid in "an *ex parte* investigation to determine whether a crime has been committed and whether criminal proceedings should be instituted against any person."[28] *United States v. Calandra*, 414 U.S. 338, 343–44, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). "Such an investigation may be triggered by tips, rumors, evidence proffered by the prosecutor, or the personal knowledge of the grand jurors." *Branzburg*, 408 U.S. at 701, 92 S.Ct. 2646. But even when such detentions might be useful, it must be balanced against a witness's fundamental right to liberty. As the Rhode Island Supreme Court explained when discussing a material witness who had been unlawfully detained:

> Liberty is precious beyond compare. Indeed it was once eloquently proclaimed at a critical moment of our country's history that life itself would be too dear if purchased at the price of chains and slavery. To the innocent even a momentary deprivation of liberty is intolerable. . . . Confinement of the plaintiff [as a material witness] among criminals and forcing him to wear prison garb added the grossest insult to injury. Such maltreatment cannot be fully compensated for by pecuniary damages.

**28.** Other reasons may motivate prosecutors and law enforcement officers to rely upon the material witness statute. Attorney General John Ashcroft has been reported as saying: "Aggressive detention of lawbreakers and material witnesses is vital to preventing, disrupting or delaying new attacks." Cam Simpson, "Roundup Unnerves Oklahoma Muslims," 4/21/02 Chi. Trib. 1, *available at* 2002 WL 2647213 (quoting Attorney General John Ashcroft). Relying on the material witness statute to detain people who are presumed innocent under our Constitution in order to prevent potential crimes is an illegitimate use of the statute. If there is probable cause to believe an individual has committed a crime or is conspiring to commit a crime, then the government may lawfully arrest that person, but *only* upon such a showing.

*Quince v. State,* 94 R.I. 200, 179 A.2d 485, 487 (1962).

The grand jury already has the ability to ask a court to subpoena an individual who must then testify or face criminal sanctions. *See* Fed.R.Crim.P. 17. While this infringes on an individual's liberty, it is nonetheless a reasonable measure to secure information about a potential crime because the extent of the intrusion on the witness's liberty is *minimal.* A subpoenaed witness, for example, would not be repeatedly strip-searched, shackled whenever he is moved, denied food that complies with his religious needs, or prohibited from seeing or even calling his family over the course of twenty days and then testifying while handcuffed to a chair.

Indeed, the need to respect individual liberty was a major concern of legislators who drafted the material witness statute. After many years of studying the issue, Congress attempted to strike a reasonable balance among the three competing interests that are at stake when a defendant is prosecuted: Society's interest in enforcing the law, a defendant's Sixth Amendment right to confront the witnesses against him, and a witness's liberty interest. *See* Comment, "Pretrial Detention of Witnesses," 117 *U. Pa. L.Rev.* at 702–03. In Congress's view, a reasonable balance was to require that "[n]o material witness may be detained because of inability to comply with any condition of release if the testimony of such witness can adequately be secured by deposition...." 18 U.S.C. § 3144. This solution allows the prosecution to obtain testimony for use at trial, permits the defendant to confront the witness as the Constitution requires, and only intrudes on the witness's liberty for the time that is *necessary* to obtain his testimony.

The government vigorously argues that the deposition provision of section 3144

cannot apply to grand jury proceedings. *See* Gov't Mem. at 66–68. For example, while depositions require that both the prosecution and defense counsel be present, counsel for the target or the witness are prohibited from being in the grand jury room during the witness's testimony. *See* Fed.R.Crim.P. 6(d). Likewise, while Rule 15 requires "the taking of depositions on notice to the opposing party [,] no such 'opposing party' exists until criminal charges against a defendant have been filed." Gov't Mem. at 67. Although the government's explanation of Rule 15 is correct, its interpretation of section 3144 is not. The inapplicability of Rule 15 to grand jury proceedings only means that interpreting section 3144 to cover grand jury investigations would eviscerate the limitation that Congress carefully placed upon the government's power to detain uncharged witnesses.

Moreover, the government's interpretation of section 3144 would contradict well-established Supreme Court precedent. In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court considered the question of how far law enforcement officers could intrude on a person's liberty given their interest in "effective crime prevention and detection," the same interests that underlie grand jury investigations. *Id.* at 22, 88 S.Ct. 1868. Investigating criminal behavior is a government interest and, as *Terry* explains, this interest may justify a temporary seizure. But the Court emphasized that the detention must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 20, 88 S.Ct. 1868. In order to be deemed a reasonable seizure, as the Fourth Amendment requires, "[t]he scope of the detention *must be* carefully tailored to its underlying justification." *Florida v. Royer,* 460 U.S. 491, 501, 103 S.Ct. 1319,

75 L.Ed.2d 229 (1983) (emphasis added). "In our society liberty is the norm, and detention ... without trial is the *carefully limited* exception." *United States v. Salerno*, 481 U.S. 739, 755, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (emphasis added). A review of the legislative history of the Bail Reform Acts of 1966 and 1984 shows that when Congress enacted both of those laws there was "careful delineation of the circumstances under which detention [would] be permitted...." *Id.* at 750, 107 S.Ct. 2095. The imprisonment of Awadallah as a high-security inmate for twenty days illustrates that the limitations in section 3144 are meaningless if the statute applies to grand jury witnesses. Such an interpretation poses the threat of making detention the norm and liberty the exception.[29]

If Congress chooses to enact a law that permits the detention of a witness material to a grand jury investigation, the law will undoubtedly reflect the same level of deliberation and Congressional concern for balancing the government's interest in grand jury proceedings against a person's liberty interest. If such a law is enacted, the only role of the courts will be to interpret the statute as it is written and determine whether it survives constitutional scrutiny. But section 3144 is not that law.

### C. Remedy

▮▮▮▮ Courts have a "traditional responsibility to guard against [government] conduct which is over-bearing or harassing, or which trenches upon personal security...." *Terry*, 392 U.S. at 15, 88 S.Ct. 1868. "When such conduct is identified, it must be condemned by the judiciary and

**29.** This broad reading of the material witness statute, permitting lengthy detention of witnesses who may have information relevant to a grand jury investigation, has led to serious abuses. For example, Abdallah Higazy, an Egyptian-born student was arrested, pursuant to a material witness warrant, on December 17, 2001, when he returned to a hotel near the World Trade Center to retrieve possessions that he had left behind on September 11th. The FBI agents confronted him with the accusation that he had left a ground-to-air radio at the hotel. Higazy denied that the radio belonged to him. During his three weeks of detentions as a material witness, Higazy was subjected to three sets of interviews, the last of which involved a polygraph examination. According to Robert Dunn, Higazy's lawyer:

> Mr. Higazy was always anxious to indicate and prove his innocence in this case. So he had voluntarily submitted himself, and I had given permission for him to be given a polygraph exam.... [During the exam] the agent came out and I said, "how's the polygraph going?" He says, "We don't [have] a polygraph, but we have a confession." I was astonished. I went in, I said, "Abdallah, what's he talking about, there was a confession?" At that point, Abdallah was visibly upset. He said that he had had [sic]

almost fainted at some point, that he didn't recall exactly what he said but he began to have the sense that there was no way in the world that he could convince the government that he didn't have this unit and that he may have acquiesced in some manner to having had it.

1/18/02 ABC News: Good Morning America Interview, *available at* 2002 WL 2968503. It does not appear that he ever testified before the grand jury. Based on this alleged confession, the government charged Higazy on January 11, 2002, with lying to federal investigators and "accused Higazy of interfering with the investigation 'in a profound and fundamental way.'" Larry Neumeister, "Egyptian with Pilot Radio Charged," 1/11/02 AP Online, *available at* 2002 WL 3703260 (quoting an Assistant U.S. Attorney). Bail was denied. Five days later, the government dropped the charges after another hotel guest came forward to claim the radio. Higazy was released in his cotton prison scrubs and given three dollars for subway fare. "Higazy spent 31 days [in the New York MCC], all but a few hours in solitary confinement." Christine Haughney, "A Sept. 11 Casualty: 'Radio Man' Jailed for A Month, Then Freed; Egyptian Student Perplexed by Mistaken Arrest," 3/11/02 Wash. Post, at A3, *available at* 2002 WL 15844201.

its fruits must be excluded from evidence in criminal trials." *Id. See also Awadallah II,* —— F:Supp.3d at ——, 2002 WL 123478, at *25. Awadallah's testimony before the grand jury was undoubtedly the product of an unlawful seizure because the government lacked the statutory authority to detain him under section 3144.[30]

### 1. The Government's Argument

The government argues that Awadallah's grand jury testimony should not be suppressed because "[it] is not causally connected to his arrest on the material witness warrant." Gov't Mem. at 83. According to the government, " '[our] cases make clear that evidence will not be excluded as "fruit" unless the illegality is at least the "but for" cause of the discovery of the evidence.' " *Id.* (quoting *Segura v. United States,* 468 U.S. 796, 815, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984)). The prosecution asserts that its conduct was not the "but for" cause of Awadallah's testimony because "[a]ssuming that the Government had not sought a material witness warrant, Awadallah still would have been served with a subpoena to appear before the grand jury in New York, and would have been questioned on the same subjects." Gov't Mem. at 83.

The government misses the point. In *Segura,* the Court held that, where the police initially conducted an illegal search and then subsequently searched the same area pursuant to a valid warrant, the "independent source" doctrine permits the admission of evidence discovered for the

first time during the second (lawful) search. 468 U.S. at 804, 104 S.Ct. 3380. In doing so, the Court explained that "the exclusionary rule reaches not only *primary evidence obtained as a direct result of an illegal search or seizure,* but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.' " *Id.* (quoting *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939))(emphasis added) (citation omitted).

"[I]n the classic independent source situation, information which is received through an illegal source is considered to be cleanly obtained when it arrives through an independent source." *Murray v. United States,* 487 U.S. 533, 539, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988) (quoting *United States v. Silvestri,* 787 F.2d 736, 739 (1st Cir.1986)). Here, there was no "independent source" through which Awadallah's grand jury testimony was, in fact, obtained. Because Awadallah's testimony was obtained as a direct result of his unlawful detainment, rather than from any independent source, it must be suppressed.

### 2. Inevitable Discovery Doctrine

 The "inevitable discovery doctrine" is similarly unavailing. "The inevitable discovery doctrine allows evidence procured as a result of an illegal [seizure] to be introduced if 'the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.' " *United States v. Cabassa,*

---

**30.** It should be emphasized that, even if the government had the statutory authority to detain Awadallah, the question would remain as to whether the government nonetheless violated Awadallah's Fourth Amendment rights. Even when the government acts with probable cause and a warrant, government actions must be reasonable. *See Winston v. Lee,* 470 U.S. 753, 763–66, 105 S.Ct. 1611, 84 L.Ed.2d

662 (1985) (holding that the surgical removal of a bullet was, on the facts of the case, unreasonable, despite judicial review and authorization and probable cause). The prolonged detention of a previously cooperative material witness for a grand jury may have been so unreasonable as to have violated Awadallah's Fourth Amendment rights even if the detention was authorized by statute.

62 F.3d 470, 472 (2d Cir.1995) (quoting *Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984)). This argument fails for two reasons.

*First,* the Second Circuit has indicated that the inevitable discovery exception does not apply when the government took *no steps* to obtain the evidence through lawful means. *See id.* ("[T]he extent of completion [in obtaining a lawful warrant] relates directly to the question of whether a warrant would in fact have issued . . . ."); *United States v. Roberts,* 852 F.2d 671 (2d Cir.1988) ("The government contends that it inevitably would have discovered the documents under a subpoena that it had issued several months before the search of the premises. The mere fact that the government serves a subpoena, however, does not mean that it will obtain the documents it requests.").[31] In this case, the government never took any steps at any time to secure a subpoena requiring Awadallah to testify before the grand jury.

*Second,* while the doctrine of inevitable discovery may apply in the context of physical evidence, it makes little sense to apply it to statements that are obtained while the defendant is unlawfully seized. *See Brewer v. Williams,* 430 U.S. 387, 407 n. 12, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) ("While neither [the defendant's] *incriminating statements themselves* [obtained during an unlawful interrogation] nor any testimony describing his having led the police to the victim's body can constitutionally be admitted into evidence, evidence of where the body was found and of its condition might well be admissible on the theory that the body would have been discovered in any event, even had incriminating state-ments not been elicited from [the defendant].") (emphasis added). "The doctrine of inevitable discovery allows for the admission of evidence *derived* from a defendant's unconstitutional inculpatory statement, provided that the evidence would inevitably have been discovered by independent legal means." *United States v. Polanco,* 93 F.3d 555, 561 (9th Cir.1996) (emphasis in original). "The inevitable discovery doctrine does not, however, allow admission of the unconstitutional inculpatory statement itself." *Id.*

The rationale behind this distinction is self-evident. Absent intentional spoliation, physical evidence is tangible and fixed. While it is movable, it is not transmutable. The same can never be said of statements. "A tangible object is hard evidence, and absent its removal will remain where left until discovered. In contrast, a statement not yet made is, by its very nature, evanescent and ephemeral. Should the conditions under which it was made change, even but a little, there could be no assurance the statement would be the same." *United States v. Vasquez De Reyes,* 149 F.3d 192, 195 (3d Cir.1998) (holding that statements acquired as a result of an illegal stop were not admissible under inevitable discovery doctrine).

Indeed, the distinction between physical evidence and statements is particularly relevant in this case. While it is true that had Awadallah not been arrested he could have been subpoenaed to appear in the grand jury, and it is also true that he might well have been asked the same questions by the prosecutors, it cannot be said that he would have given the same

---

**31.** *See also United States v. Mejia,* 69 F.3d 309, 319–20 (9th Cir.1995) ("We reject the contention that [the inevitable discovery] doctrine applies where the police had probable cause to conduct a search but simply failed to obtain a warrant. . . . If evidence were admit-ted notwithstanding the officers' unexcused failure to obtain a warrant, simply because probable cause existed, then there would never be *any* reason for officers to seek a warrant.") (emphasis in original).

testimony. No one will ever know how Awadallah would have testified had he been subpoenaed rather than imprisoned.

If Awadallah had been subpoenaed, he would have testified at liberty and not after twenty days in custody. Nor would he have been required to testify while handcuffed to a chair. He would have had continued access to counsel during the time between service of the subpoena and his appearance before the grand jury. He might have consulted with more than one counsel. He might have discussed the matter with family, friends, or even his teacher, Ms. Pollack. He might have reviewed the examination booklet. Indeed, while legally insufficient to rise to the level of recantation, he corrected his alleged perjured testimony on October 15, 2001, after having the opportunity to review the examination booklet. Moreover, Awadallah would have been well-fed and well-rested, well-prepared and probably less frightened.

The assumption that his testimony before the grand jury would have "inevitably" produced the same testimony is raw speculation. The "inevitable discovery" doctrine is not based on speculation and is therefore inapplicable. Accordingly, the grand jury testimony must be suppressed.

## V. CONCLUSION

If the government has probable cause to believe a person has committed a crime, it may arrest that person. Indeed, if the government suspects a person may have committed a crime, regardless of the reasons that motivate that suspicion, it may use all of its resources to confirm that suspicion by gathering evidence to establish probable cause that the person committed a crime.

But since 1789, no Congress has granted the government the authority to imprison an innocent person in order to guarantee that he will testify before a grand jury conducting a criminal investigation.[32] A proper respect for the laws that Congress does enact—as well as the inalienable right to liberty—prohibits this Court from re-writing the law, no matter how exigent the circumstances.

Because Awadallah was unlawfully detained, his grand jury testimony must be suppressed. The indictment is therefore dismissed.

SO ORDERED.

---

32. *See supra* note 24 (citing material witness statutes from 1789, 1846, and 1928).